1  Bradley W. Madsen
   Nevada Bar No. 11644
2  MICHAEL BEST & FRIEDRICH LLP
   2750 East Cottonwood Parkway, Suite 560
3  Cottonwood Heights, UT 84121[1]
   Telephone: 801.833.0500
4  Facsimile:  801.931.2500
   bwmadsen@michaelbest.com
5
6  *Attorney for Plaintiffs Krishna Okhandiar*
   *and Remilia Corporation LLC*

7
                     **UNITED STATES DISTRICT COURT**
8                         **DISTRICT OF NEVADA**

9  KRISHNA OKHANDIAR, an individual,          Case No.: 2:23-cv-1409
10
   and REMILIA CORPORATION LLC, a
11
   Delaware limited liability company,
12
           Plaintiffs,
13
14 v.                                         **COMPLAINT**
15 JOHN DUFF III, an individual,
16 HENRY SMITH, an individual, and
17 MAXWELL ROUX, an individual,
18
           Defendants.
19

20      Plaintiffs Krishna Okhandiar and Remilia Corporation LLC, by and through their
21
   undersigned counsel, hereby complain against Defendants John Duff III, Henry Smith, and
22
   Maxwell Roux and for causes of action allege as follows:
23

24

25

26 _____
27 [1] Pursuant to LR 11-1(b), attorney Jonathan Heaton is designated for local service at address
   7285 Dean Martin Dr. Ste 180, Las Vegas, NV 89118.
28

**PARTIES**

1.      At all times mentioned herein, Plaintiff Krishna Okhandiar is and was a citizen and resident of the State of Nevada.  Krishna Okhandiar is also known, predominantly in internet contexts, by numerous aliases including "Charlotte Fang," and "Charlie Fang."

2.      Plaintiff Remilia Corporation LLC (collectively, with Plaintiff Krishna Okhandiar, "Remilia") is and was a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 89 Arthur Hills Ct, Last Vegas, Nevada 89074.

3.      At all times since its formation in July 2022, Okhandiar is and was the CEO and sole member of Remilia Corporation LLC.

4.      Defendant John Duff III is an individual who, upon information and belief, is a citizen and resident of the State of New York.  Defendant Duff is also known, predominantly in internet contexts, by numerous aliases including "ccc," "ccccaa,", "ywwv" and "ika."

5.      Defendant Henry Smith is an individual who, upon information and belief, is a citizen and resident of New Zealand.  Defendant Smith is also known, predominantly in internet contexts, by numerous aliases including "Sprite, "Sonora Milady," and "Nijino Saki."

6.      Defendant Maxwell Roux is an individual who, upon information and belief, is a citizen and resident of the State of Montana.  Defendant Roux is also known, predominantly in internet contexts, by numerous aliases including "Reginald," "Q," "Hiro," and "Peabody."

**JURISDICTION AND VENUE**

7.      The adverse parties are citizens of different States and of a foreign state, and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

8.      Remilia asserts causes of action arising under federal statutes and asserts other

causes of action that are related to, and form part of the same case or controversy as, the federal causes of action.

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity of citizenship), and/or 28 U.S.C. § 1367 (supplemental jurisdiction).

10.     This Court has personal jurisdiction over Defendants because Defendants purposely directed their activities toward Nevada, including by, without limitation, purposely agreeing to perform work as independent contractors for a business that conducts operations in Nevada, forming a conspiracy to seize control of virtual servers used for a business operating from Nevada and purchased by the business from Nevada, and furthering the goals of the conspiracy by causing extortive demands and communications about those demands to be sent to Remilia in Nevada.

11.     Venue is proper in this district under 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

12.     In January 2021, Okhandiar formed a digital-art- and NFT-related business that publicly became known under the trade name Remilia.

13.     Since its inception, Remilia has remained under Okhandiar's sole direction and leadership, a fact well-known and often acknowledged by Defendants, until now.

14.     In April 2019, Okhandiar created an account with DigitalOcean, a cloud-based data hosting and service provider, and in January 2021 began to pay for DigitalOcean virtual servers to host Remilia's digital assets, including, but not limited to, Remilia's merchant site data, digital art, codebase, and other intellectual property.

15.     Since its creation, the DigitalOcean account has been associated with Okhandiar's former residence in Illinois and now his current residence in Nevada, as well as with his personal email address.

16.     The monthly bills for the DigitalOcean virtual servers used for Remilia's business have always been sent by email to Okhandiar's personal email address and/or by mail to Okhandiar's home addresses.

17.      The monthly bills for the DigitalOcean virtual servers used for Remilia's business have always been paid from Okhandiar's personal accounts.

18.     In connection with its business, Remilia has established a number of accounts with social media platforms, including Instagram and Twitter, to market or otherwise promote its business.

19.     In 2021, Defendant Smith began to perform work for Remilia as an independent contractor in the role of artist.

20.     In 2022, Defendant Smith continued performing work for Remilia as an independent contractor in a new role as creative director.

21.     In connection with his work for Remilia, Defendant Smith executed a Confidentiality and Non-disclosure Undertaking on November 16, 2022 (the "Smith NDA"), which identifies Plaintiff Remilia Corporation LLC as the "Discloser" and Defendant Smith as the "Recipient."

22.     In the Smith NDA, Defendant Smith agreed that:

> (a)     all rights, title and interest in any Intellectual Property,[2] and any improvements thereto, that the Recipient conceives, develops, invents,

---

[2] The Smith NDA defines Intellectual Property to mean: "Confidential Information, copyright works, trademarks, industrial designs, design rights, inventions (whether patentable or not), unpublished patent applications, inventive ideas, discoveries, innovations, developments, or improvements thereto, or any other intellectual property rights relating to any of the foregoing, whether registered or non-registered, whether or not reduced to written form or

authors, creates or contributes to the creation or improvement of, in whole or in part, during the term of the Recipient's services are, will be and shall remain the exclusive property of the Discloser; and

(b)     the Recipient shall have no interest in any Intellectual Property, and any other form of intellectual property, notwithstanding that the Recipient may have conceived, developed, authored, created or contributed to the creation or improvement of the same, solely or jointly with others at any time during the term of the Recipient's services.

23.     In the Smith NDA, Defendant Smith further agreed that:

Upon the request of the Discloser, the Recipient shall, within seven (7) days of such request from the Discloser, either destroy and delete from any server, device or platform, all Confidential Information or return to the Discloser all Confidential Information, including all Copies thereof.

24.     In the Smith NDA, Defendant Smith also agreed that:

The Recipient shall . . . not copy, scrape, extract, photocopy, store, copy and paste, or share, like, post or tweet screenshots from desktop, tablet or mobile devices, or otherwise reproduce, without the prior express written permission of the Discloser, any of the Confidential Information.

25.     In December 2020, Defendant Duff met with Okhandiar in Nevada where he was first informed about Okhandiar's intentions to start Remilia and discussed a potential position to perform work for Remilia.

26.     In 2021, Defendant Duff began to perform work for Remilia as an independent contractor in the role of smart contract developer.

---

practice, within the scope of the Discloser's business activities and the Services rendered."  In turn, Confidential Information includes "all information, business strategies, plans, ongoing discussions and commitments, data, documents, agreements, files and other materials in whatever form (including, without limitation, in written, oral, visual or electronic or digital form in or on any media or platform), which is disclosed or otherwise furnished by the Discloser to the Recipient, or created, owned or controlled by the Discloser, whether or not such information is marked confidential, that relates directly or indirectly to the Discloser's business, products, services, suppliers, and trade secrets, overall strategy, or personal information relating to anonymous or other individuals" as well as "all or any portion of analysis, notations, plans, compilations, reports, forecasts, studies, samples, statistics, summaries, interpretations and other documents created, developed, prepared, received, obtained, or generated or derived from such information, data, documents, agreements, files or other materials by the Recipient in connection with the Services[.]"

27.     In 2022, Defendant Duff continued performing work for Remilia as an independent contractor in a new role as director of software development.

28.     In connection with his work for Remilia, Defendant Duff executed a Confidentiality and Non-disclosure Undertaking on December 28, 2022 (the "Duff NDA"), which identifies Plaintiff Remilia Corporation LLC as the "Discloser" and Defendant Duff as the "Recipient."

29.     In the Duff NDA, Defendant Duff agreed that:

>    a.      all rights, title and interest in any Intellectual Property,[3] and any improvements thereto, that the Recipient conceives, develops, invents, authors, creates or contributes to the creation or improvement of, in whole or in part, during the term of the Recipient's services are, will be and shall remain the exclusive property of the Discloser; and

>    b.      the Recipient shall have no interest in any Intellectual Property, and any other form of intellectual property, notwithstanding that the Recipient may have conceived, developed, authored, created or contributed to the creation or improvement of the same, solely or jointly with others at any time during the term of the Recipient's services.

30.     In the Duff NDA, Defendant Duff further agreed that:

>    Upon the request of the Discloser, the Recipient shall, within seven (7) days of such request from the Discloser, either destroy and delete from any server, device or platform, all Confidential Information or return to the Discloser all Confidential Information, including all Copies thereof.

31.     In the Duff NDA, Defendant Duff also agreed that:

>    The Recipient shall . . . not copy, scrape, extract, photocopy, store, copy and paste, or share, like, post or tweet screenshots from desktop, tablet or mobile devices, or otherwise reproduce, without the prior express written permission of the Discloser, any of the Confidential Information.

32.     In connection with his work for Remilia, Defendant Duff executed a Letter of Intent on December 28, 2022 (the "Duff LOI") with Plaintiff Remilia Corporation LLC.

33.     In the Duff LOI, Defendant Duff agreed that:

---

[3] The Duff NDA's definitions of Intellectual Property and Confidential Information are the same those of the Smith NDA.

All intellectual property created in the course of fulfilling the obligations included in the Role and Commitment sections above, as well as intellectual property created using Remilia resources, are the absolute property of Remilia, and by operating under this Letter of Intent as an employee, you agree to vest all such intellectual property in Remilia. For the purposes hereinabove, the CEO of Remilia is granted the power to sign and execute any instruments necessary to vest such intellectual property in Remilia.

34.   In 2022, Defendant Roux first engaged with Remilia on a project basis as an independent contractor in the role of project manager.

35.   In September 2022, Defendant Roux began to perform work for Remilia as an independent contractor in the role of gaming analyst.

36.   In connection with his work for Remilia, Defendant Roux executed a Confidentiality and Non-disclosure Undertaking on November 16, 2022 (the "Roux NDA"), which identifies Plaintiff Remilia Corporation LLC as the "Discloser" and Defendant Roux as the "Recipient."

37.   In the Roux NDA, Defendant Roux agreed that:

a.   all rights, title and interest in any Intellectual Property,[4] and any improvements thereto, that the Recipient conceives, develops, invents, authors, creates or contributes to the creation or improvement of, in whole or in part, during the term of the Recipient's services are, will be and shall remain the exclusive property of the Discloser; and

b.   the Recipient shall have no interest in any Intellectual Property, and any other form of intellectual property, notwithstanding that the Recipient may have conceived, developed, authored, created or contributed to the creation or improvement of the same, solely or jointly with others at any time during the term of the Recipient's services.

38.   In the Roux NDA, Defendant Roux further agreed that:

Upon the request of the Discloser, the Recipient shall, within seven (7) days of such request from the Discloser, either destroy and delete from any server, device or platform, all Confidential Information or return to the Discloser all Confidential Information, including all Copies thereof.

---

[4] The Roux NDA's definitions of Intellectual Property and Confidential Information are the same those of the Smith NDA.

39.     In the Roux NDA, Defendant Roux also agreed that:

> The Recipient shall not copy, scrape, extract, photocopy, store, copy and paste, or share, like, post or tweet screenshots from desktop, tablet or mobile devices, or otherwise reproduce, without the prior express written permission of the Discloser, any of the Confidential Information.

40.     In the independent-contractor relationships between Defendants and Remilia, each Defendant agreed to receive consulting fees for his work.

41.     At no time during the negotiation of any contract with Remilia did any Defendant attempt to negotiate any equity share in Remilia in lieu of the consulting fee each Defendant agreed to receive.

42.     Contrary to any claim that Defendants sought equity shares in Remilia while negotiating their contracts due their belief in Remilia's values and continued success, Defendants agreed to cash payments without any complaint or hesitation.

43.     Contrary to any claim that Defendants agreed to lower cash payment in the expectation of receiving equity shares, the cash payments Defendants received were above the going market rates for the roles they agreed to perform in view of their work experience at the time.

44.     Upon information and belief, no Defendant had any professional work experience or management experience prior to their roles with Remilia.

45.     When each Defendant took on a management role, each failed to perform at an adequate level.  Due to poor performance in management, each Defendant was then placed into an individual contributor role. At the time of the complaint, no Defendant managed any Remilia personnel who reported directly to them.

46.     Each Defendant received consulting fees as agreed despite their demotion in responsibility.

47.     In approximately March 2023, Remilia informed Defendant Roux of plans to raise capital for additional projects and endeavors of Remilia.

48.     In response to learning of plans to raise capital, Defendant Roux expressed his opinion that he and the other Defendants deserved greater compensation.

49.     In April 2023, Defendants, including Roux, attended an event organized by Remilia in Tokyo, Japan, known as "Remilia Con."  The event occurred on April 14 and 15, 2023, with Defendants arriving in Tokyo before and staying after the event.

50.     Defendants met and communicated in private during Remilia Con and, on information and belief, used their time together to coordinate and agree to the activities described hereinafter.

51.     While in Tokyo and at other times through apps and electronic devices that Defendants commonly used to communicate with each other and others, Defendants and others jointly agreed to commit the torts against Remilia described herein, forming or joining a conspiracy.

52.     In April 2023, near the time of Defendants' meetings in Tokyo during Remilia Con, Defendant Duff surreptitiously and wrongfully seized control of specific Remilia NFT assets by knowingly exceeding the limited business access and authority granted to him by Remilia and in violation of his duties under the aforementioned agreements.

53.     Defendant Duff's surreptitious and wrongful seizure included taking technical measures to cause the revenue produced by Remilia's NFT assets to be delivered to an account (i.e., a "wallet") subject to his control and not Remilia's control.

54.     Because Defendant Duff took steps to conceal his actions, Remilia was unaware until September 2023 that Defendant Duff had surreptitiously and wrongfully seized control of Remilia's NFT assets by causing the revenue produced by the assets to be delivered to an account or wallet subject to his control and not Remilia's control.

55.     In approximately July 2023, Defendant Roux acknowledged to Remilia personnel that he had disclosed to others Remilia's plans to raise capital, despite being directed to keep the information confidential.

56.     On August 21, 2023, at approximately 6:00 P.M. EDT, Remilia personnel discovered that an unknown person had seized control of one of Remilia's Twitter accounts, called the Milady Maker Twitter account and known by the identifier "@miladymaker."

57.     The person seized control of the Milady Maker Twitter account by changing the account's login information and logging out Remilia personnel without authorization, which prevented Remilia personnel responsible for the account from accessing it.

58.     Soon thereafter, Remilia personnel began investigating the incident and implementing security procedures, including by, among other things, assessing the status of Remilia's other social media accounts.

59.     During the investigation, Remilia personnel became aware of attempts, occurring around the same time,  by an unknown person to seize control of several other of Remilia's social media accounts, including Remilia's Instagram account (known by the identifier "@remiliaco"), its Soundcloud account (known by the identifier "remiliaco"), its Bonkler Twitter account (known by the identifier "@BonklerNFT"), and its Remilio Twitter account (known by the identifier "@Remilionaire), using the same or a similar method.

60.     During the investigation, Remilia personnel obtained records from Instagram showing that the person attempting to seize control of Remilia's Remiliaco Instagram account had attempted to change the email address associated with the account to the personal email address of Defendant Smith without authorization.

61.     The personal email address described above was known by Remilia personnel to belong to Defendant Smith and contains one of Defendant Smith's aliases.

62.     During the investigation, Remilia personnel obtained records from Twitter showing that the person attempting to seize control of Remilia's Bonkler account had attempted to change the email address associated with the account to the personal email address of Defendant Smith and that the attempts to initiate the account changes originated from an IP address located in New Zealand, where Defendant Smith resides.

63.     During the investigation, Remilia personnel obtained records from its email provider showing that Defendant Smith had attempted to change the password associated with the Remilia Soundcloud account without authorization.

64.     Remilia personnel were able to re-obtain access to the Bonkler Twitter and Remilia Soundcloud through their support systems, but lost control of the Milady Maker Twitter, Remilio Twitter, and Remiliaco Instagram, the primary social media of the business.

65.     Due to the seizure in whole or in part of Remilia's social media accounts in the manner described above, Remilia has lost, among other things, operational control over its social media marketing and presence.

66.     The seizure in whole or in part of Remilia's social media accounts required the involved Defendants to knowingly and intentionally exceed the scope of the limited business access and authorization to those accounts that they had been granted by Remilia.

67.    On August 22, at approximately 2:30 P.M. EDT, Remilia personnel also became aware that an unknown person had seized control of Remilia's GitHub software-development account.

68.    Soon thereafter, Remilia personnel began investigating the incident and implementing additional security procedures, including by, among other things, assessing or re-assessing the status of Remilia's software-development accounts and assets.

69.    During the investigation, Remilia personnel became aware that an unknown person had also seized control of multiple servers hosted on Remilia's DigitalOcean virtual server account.

70.    During the investigation, Remilia personnel obtained records from DigitalOcean showing that, on Sunday, August 20, 2023, at approximately 8:30 P.M. EDT, the person had commenced copying the virtual servers and had then transferred copies of the files stored on the servers to a separate account.

71.    The DigitalOcean records showed that the person who had copied the virtual servers had accessed the account using Defendant Duff's alias, ccccaa.

72.    The DigitalOcean records also showed that the separate account to which the person had transferred the copied virtual servers and affiliated files was associated with the personal email address of Defendant Duff.

73.    The personal email address described above was known by Remilia personnel to belong to Defendant Duff and contains one of Defendant Duff's aliases.

74.    The DigitalOcean records further showed that about six hours later, on August 21, 2023, at approximately 2:30 A.M. EDT, the person who had copied the virtual server and

transferred the copies commenced destroying the server files in Remilia's account that had been copied and transferred.

75.     The DigitalOcean records also showed that the person who had destroyed the virtual server files had accessed the account using Defendant Duff's alias, ccccaa.

76.     The day following the seizure of the Remilia's DigitalOcean virtual server, August 22, 2023, the head of Remilia's project management office ("PMO") had been scheduled to meet with Defendant Duff to conduct an audit of security practices employed by Defendant Duff.

77.     Defendant Duff failed to attend the scheduled meeting.

78.     Defendant Duff's seizure of Remilia's Digital Ocean virtual server, described above, required Defendant duff to knowingly exceed the limited business access and authorization to protected computers granted to him by Remilia.

79.     Due to the seizure of Remilia's DigitalOcean virtual server, as well as the seizure in whole or in part of Remilia's other software-development accounts and assets, in the manner described above, Remilia has lost, among other things, operational control over its codebases for its active and in-development projects and over its NFT merchant site.

80.     From the evening of August 21, 2023, when Remilia personnel first became aware of efforts to seize control of its accounts and assets, to the evening of August 22, 2023, Remilia personnel engaged in numerous attempts to communicate with Defendant Smith and Defendant Duff using the apps through which Remilia personnel had normally communicated with them.

81.     Neither Defendant Smith nor Defendant Duff responded to the attempted communications, despite the apps showing that both Defendant Smith and Defendant Duff had read or seen many of the attempts to message or call them.

82.     After reading several messages from Remilia personnel without responding, Defendant Smith changed the settings on one of his apps so that he could no longer be contacted.

83.     Both Defendant Smith's and Defendant Duff's personal social media accounts show that they were actively online and using the very same apps through which Remilia personnel attempted to communicate with them at or near the time of Remilia' personnel's numerous attempts to communicate with them.

84.     On August 22, 2023, at approximately 9:30 P.M. EDT, Remilia personnel attempted to communicate with Defendant Roux via the app normally used to do so regarding the seizure of Remilia's accounts and assets, but Defendant Roux did not respond despite the app showing that Defendant Roux had read message sent to him.

85.     At this time, it became clear Defendant Roux had also wrongfully seized control of the social media account assigned to him and that he did so by knowingly exceeding the limited business authorization and access granted to him by Remilia.

86.     On August 23, 2023, at approximately 2:30 A.M. EDT, hours after Okhandiar and other Remilia personnel had messaged him regarding the seizure of Remilia's assets and accounts, Defendant Duff finally responded by sending a text message to Okhandiar in Nevada directing him to check his Remilia email account.

87.     The only relevant email that had been received recently in the email account was an email from Defendant Duff's attorney, Jonathan Hersey.

88.     Remilia received the email on August 22, 2023, at approximately 7:18 P.M. EDT, roughly only 48 hours after the DigitalOcean virtual servers had been copied, transferred, and destroyed from Remilia's account and only approximately 12 hours after Remilia personnel first became aware of attempts to seize control of Remilia's accounts and assets.

89.     Attached to the Hersey Email was a letter to Remilia from Jonathan Hersey, an attorney, on behalf of Defendant Smith, Defendant Duff, Defendant Roux, and Bruno Nispel, demanding, among other things, that Remilia give each of them varying amounts of additional compensation, appoint each of them executive officers and board members of an entity controlling Remilia's business, issue to each of them shares in that entity totaling 80% of its equity, and transfer all Remilia's assets to that entity (the "Demand Letter").

90.     The Demand Letter gave Remilia until 12:00 P.M. EDT, on August 25, 2023—less than 3 days—to respond Defendants' and Mr. Nispel's demands.

91.     On August 23, 2023,  Defendant Duff caused the revenue produced by Remilia's NFT assets that he had surreptitiously and wrongfully seized control of in April 2023 to be delivered to a different account or wallet subject to his control and not Remilia's control.

92.     On information and belief, Defendant Duff caused the revenue to be delivered to a different account or wallet because of his concern that Remilia would take steps to obtain access to and control of the initial account or wallet to which Defendant Duff had caused the revenue to be delivered in April 2023.

93.     Because Defendant Duff took steps to conceal his actions, Remilia was unaware until September 2023 that Defendant Duff had surreptitiously and wrongfully seized control of Remilia's NFT assets by causing the revenue produced by the assets to be delivered to accounts or wallets subject to his control and not Remilia's control.

94.     On August 24, 2023, the day before the demand letter's deadline, Defendant Duff removed all Remilia personnel's access to the seized codebases and informed Remilia personnel in group chats that projects and chat groups related to the codebases were temporarily disbanded.

95.     Also on August 24, 2023, Defendant Duff corresponded with one of two lead project managers contracted to Remilia and instructed him to ignore any directions from Remilia through Okhandiar and falsely informed him that Okhandiar was not the sole member and a chief officer of Remilia Corporation, LLC.

96.     Remilia did not respond by the deadline stated in the Demand Letter.

97.     On August 25, 2023, at or about 12:09 P.M. EDT—only minutes after the deadline— Remilia learned that the virtual server hosting one of Remilia's live digital products, which had previously been seized by Defendant Duff, was shut down.

98.     During the time the virtual server was shut down, and before Remilia's counsel had contacted Mr. Hersey, one of the social media accounts that Defendant Smith had previously seized, was used to post a message subtly referring to the Demand Letter.

99.     Specifically, on August 25, 2023, at approximately 1:30 P.M. EDT, the Milady Maker Twitter account posted a message displaying art associated with one of Remilia's NFT projects, along with text reading "Celebrating the start of Milady as NFT by celebrating what came first. Celebrating her by celebrating what's next."

100.    The image posted to the Milady Maker Twitter account on August 25, 2023, was identical to an image included in the Demand Letter. Additionally, the Demand letter included language describing the same image as being the "original," "first created," and "most valuable."

101.    The post to Twitter and its references to the contents of the Demand Letter, along with the circumstance of the virtual server being shut down, were intended to communicate to Remilia that if the requests of the Demand Letter were not met, the Defendants would continue to exert their control over Remilia's assets to the detriment of Remilia's operations.

102.     Following the shutdown of the virtual server, counsel for Remilia contacted Mr. Hersey stating that Remilia planned to reply to the Demand Letter in due course.

103.     Within hours after Remilia's counsel contacted Mr. Hersey, the virtual server that had been shut down became fully active again.

104.     On August 28, 2023, Defendant Duff again sent a text message to Okhandiar in Nevada, stating that Defendants and Mr. Nispel were waiting for a response to the Demand Letter and further threatening to make the issues raised in the Demand Letter public.

105.     Due to the seizure of Remilia's servers, codebases, intellectual property and social media accounts, Remilia has been forced to freeze business operations since August 20, 2023, including all active software development and all primary social media.

106.     Due to the seizure of Remilia's accounts and assets described above, Remilia has been forced to cancel or diminish public, customer- and investor-facing events, partnerships and product launches that had long been planned, resulting in harm to Remilia's reputation and good will and other harm in the form of expenditure of resources that cannot be regained.

107.     Upon information and belief, Defendants were aware that Remilia was about to engage in a substantial fundraising effort, and Defendants timed their actions to increase the risk of financial injury to Remilia and to thereby obtain additional leverage to coerce Remilia to accede to the demands made in the Demand Letter.

108.     Defendants' scheme to seize and hold hostage Remilia's accounts and assets, as described above, has caused, and, if permitted to continue, will cause further, irreparable damage and injury to Remilia in myriad ways by, among other things, harming Remilia's reputation and good will with customers and investors, decreasing the value of its digital-art- and NFT-related products, and depriving it of the exclusive use of its property.

**COUNT I**
**Conversion**

109.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

110.    Defendants committed distinct acts of dominion wrongfully exerted over Remilia's personal property by, including without limitation, accessing Remilia's accounts and assets for the purpose of seizing exclusive control over them; seizing exclusive control over Remilia's accounts and assets; preventing Remilia personnel from accessing Remilia's accounts, assets, or data contained therein; copying data contained in Remilia's accounts or assets; transferring data from Remilia's accounts or assets to other locations; removing, deleting, or otherwise destroying data contained in Remilia's accounts or assets; using Remilia's accounts or assets to engage in an extortionate scheme; and using Remilia's accounts or assets to cease, interrupt, or control Remilia's business operations.

111.    Defendants' acts were in denial of, or inconsistent with, the Remilia's title or rights in the accounts and assets.

112.    Defendants' acts were in derogation, exclusion, or defiance of Remilia's title or rights in the accounts and assets.

**COUNT II**
**Trespass to Chattels**

113.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

114.    Defendants intentionally used, intermeddled with, and dispossessed Remilia of, Remilia's chattels, including, without limitation, Remilia's accounts and assets described herein, and the data contained therein.

115.    Defendants dispossessed Remilia of chattels by, among other things, seizing Remilia's chattels without Remilia's consent, barring Remilia's access to Remilia's chattels, and destroying Remilia's chattels that were in Remilia's possession.

116.    The condition, quality, and value of Remilia's chattels have been impaired by Defendants' trespass.

117.    Remilia is entitled to immediate possession of Remilia's chattels.

118.    As a direct and proximate result of Defendants' actions, Remilia has been deprived of the use of Remilia's chattels for a substantial time and continues to be so deprived.

**COUNT III**
**Intentional Interference with Prospective Economic Advantage**

119.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

120.    At the time Defendants' seized Remilia's accounts and assets, Remilia had prospective contractual business relationships with third parties, including, among others, investors Remilia was in the process of approaching in a substantial fundraising effort.

121.    Upon information and belief, Defendant knew Remilia was commencing substantial fundraising efforts and coordinated their seizure of Remilia's accounts and assets to occur at a time when doing so would impose significant leverage on Remilia to accede to Defendants' demands.

122.    Upon information and belief, Defendants intended to harm Remilia by preventing Remilia from entering some of its contractual business relationships in furtherance of Defendants' plan to exert pressure on Remilia to accede to Defendants' demands.

123.    There was no privilege or justification for Defendants' actions.

124.    As a direct and proximate result of Defendants' actions, Remilia has been prevented

from and has been forced to discontinue engaging in the planned substantial fundraising efforts, has been prevented from entering contractual business relationships with potential investors and others, and has been further damaged to the extent Remilia incurred costs commencing fundraising activities that it has been forced to discontinue.

**COUNT IV**
**Breach of Contract**

125.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

126.    Valid contracts exist between each Defendant and Remilia, including, without limitation, the Smith NDA, the Duff NDA, the Duff LOI, and the Roux NDA.

127.    The Smith NDA is a binding and enforceable contract between Defendant Smith and Remilia.

128.    The Duff NDA is a binding and enforceable contract between Defendant Duff and Remilia.

129.    The Duff LOI is a binding and enforceable contract between Defendant Duff and Remilia.

130.    The Roux NDA is a binding and enforceable contract between Defendant Roux and Remilia.

131.    Defendants breached the contracts between them, individually, on the one hand and Remilia on the other hand by, among other things, asserting, seizing, and attempting to seize rights, title, and interest in Remilia's Intellectual Property, as defined by the relevant contracts; failing to vest in Remilia intellectual property created using Remilia resources and instead vesting or attempting to vest that intellectual property in another; copying, extracting, storing, copying-and-pasting, or reproducing Confidential Information, as defined by the relevant contracts, without

authorization; and refusing to destroy, delete, or return Confidential Information, as defined by the relevant contracts, and copies thereof.

132.    As a direct and proximate result of Defendants' breaches, Remilia has incurred, and is continuing to incur, damages in an amount to be proven at trial, but in any event no less than the value of accounts and assets Defendants have seized, which is well in excess of $75,000 exclusive of interest and costs.

## COUNT V
### Breach of the Covenant of Good Faith and Fair Dealing

133.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

134.    Valid contracts exist between each Defendant and Remilia, including, without limitation, the Smith NDA, the Duff NDA, the Duff LOI, and the Roux NDA.

135.    The Smith NDA is a binding and enforceable contract between Defendant Smith and Remilia.

136.    The Duff NDA is a binding and enforceable contract between Defendant Duff and Remilia.

137.    The Duff LOI is a binding and enforceable contract between Defendant Duff and Remilia.

138.    The Roux NDA is a binding and enforceable contract between Defendant Roux and Remilia.

139.    In connection with their contracts with Remilia, each Defendant owed to Remilia a duty of good faith and fair dealing, which included, among other things, duties to not seize Remilia's accounts and assets for Defendants' benefit; to not refuse or fail to respond to Remilia's communications concerning their use and misuse of Remilia's accounts and assets; to not

otherwise conceal, or attempt to conceal, from Remilia their use and misuse of Remilia's accounts and assets; to not deprive Remilia of Remilia's accounts and assets necessary to, or beneficial in, operating Remilia's business; and to not cause Remilia's business operations, in whole or in part, to cease.

140.    Each Defendant breached the duty of good faith and fair dealing owed to Remilia, performing in a manner that was unfaithful to the purposes of their contracts, by, among other things, seizing Remilia's accounts and assets for Defendants' benefit; refusing or failing to respond to Remilia's communications concerning their use and misuse of Remilia's accounts and assets; concealing, or attempting to conceal, from Remilia their use and misuse of Remilia's accounts and assets; depriving Remilia of Remilia's accounts and assets necessary to, or beneficial in, operating Remilia's business; and causing Remilia's business operations, in whole or in part, to cease.

141.    Due to Defendants' breaches the duty of good faith and fair dealing the each owed to Remilia, Remilia's justified expectations under the contracts with Defendants were denied.

142.    As a direct and proximate result of Defendants' breaches, Remilia has incurred, and is continuing to incur, damages in an amount to be proven at trial, but in any event no less than the value of accounts and assets Defendants have seized, which is well in excess of $75,000 exclusive of interest and costs.

**COUNT VI**
**Breach of Fiduciary Duty**

143.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

144.    Due to the nature of Remilia's business, Defendants were each entrusted by Remilia with a degree of control over Remilia's accounts and assets such that they each had fiduciary duties to Remilia, including, without limitation, duties to use Remilia's accounts and assets, as well as

their access to Remilia's accounts and assets, for Remilia's benefit and to not misappropriate Remilia's accounts and assets or use their access to Remilia's accounts and assets for their own benefit.

145.    Defendants breached their fiduciary duties to Remilia by, among other things, using Remilia's accounts and assets, as well as their access to Remilia's accounts and assets, not for Remilia's benefit, but to misappropriate Remilia's accounts and assets and use their access to Remilia's accounts and assets for their own benefit.

146.    As a direct and proximate result of Defendants' breaches, Remilia has incurred, and is continuing to incur, damages in an amount to be proven at trial, but in any event no less than the value of accounts and assets Defendants have seized, which is well in excess of $75,000 exclusive of interest and costs.

**COUNT VII**
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.**

147.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

148.    Remilia's trade secret and confidential information relates to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the United States and throughout the world.

149.    The data and information contained in Remilia's accounts and assets that Defendants seized or attempted to seize constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

150.    The above-described trade secret and confidential information derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Remilia's competitors or to other persons or entities who

might obtain economic value from their disclosure or use.

151.   At all relevant times, Remilia has taken reasonable measures to protect the secrecy of its trade secrets and confidential information, including that which Defendants have misappropriated.

152.   Remilia derives great value from the fact that this information is not readily ascertainable by others, including competitors.

153.   Defendants misappropriated Remilia's trade secrets by acquiring them through improper means, including, but not limited to, theft, copying, concealment, failing to return Remilia's trade secrets, and breach of duties.

154.   Defendants' misappropriation of Remilia's trade secrets and proprietary information constitutes a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

155.   As a direct and proximate result of Defendants' misappropriation, Remilia has incurred, and is continuing to incur, damages including, but not limited to, loss of information, loss of the secrecy of the information, lost customers, potential lost business opportunities, and a disadvantaged market position.  These and other damages suffered by Remilia are irreparable.

156.   Remilia is entitled to an award of damages in the amount of Remilia's actual losses and Defendants' unjust enrichment, including attorney fees and costs.

157.   Defendants' duplicitous activities to misappropriate Remilia's trade secrets constitute willful and malicious conduct warranting an award of exemplary damages.

**COUNT VIII**
**Violation of the Nevada Trade Secrets Act, Nev. Rev. Stat. § 600A.010 *et. seq.***

158.   Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

159.   The data and information contained in Remilia's accounts and assets that

Defendants seized or attempted to seize constitute "trade secrets" within the meaning of the Nevada Uniform Trade Secrets Act.

160.    The above-described trade secret and confidential information derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Remilia's competitors or to other persons or entities who might obtain economic value from their disclosure or use.

161.    At all relevant times, Remilia has taken reasonable measures to protect the secrecy of its trade secrets and confidential information, including that which Defendants have misappropriated.

162.    Remilia derives great value from the fact that this information is not readily ascertainable by others, including competitors.

163.    Defendants misappropriated Remilia's trade secrets by acquiring them through improper means, including, but not limited to, theft, copying, concealment, failing to return Remilia's trade secrets, and breach of duties.

164.    Defendants' misappropriation of Remilia's trade secrets and proprietary information constitutes a violation of the Nevada Uniform Trade Secrets Act, Nev. Rev. Stat. § 600A.010 et seq.

165.    As a direct and proximate result of Defendants' misappropriation, Remilia has incurred, and is continuing to incur, damages including, but not limited to, loss of information, loss of the secrecy of the information, lost customers, potential lost business opportunities, and a disadvantaged market position.  These and other damages suffered by Remilia are irreparable.

166.    Remilia is entitled to an award of damages in the amount of Remilia's actual losses and Defendants' unjust enrichment, including attorney fees and costs.

167.     Defendants' duplicitous activities to misappropriate Remilia's trade secrets constitute willful and malicious conduct warranting an award of exemplary damages.

**COUNT IX**
**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1830**

168.     Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

169.     Remilia's computers, computer systems, computer programs, computer websites, computer files, databases, and/or servers (together, "Computers") constitute protected computers within the meaning of the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1830.

170.     Defendants intentionally accessed Remilia's Computers without authorization or in a manner that exceeded their authorization.

171.     By intentionally accessing Remilia's Computers without authorization or in a manner that exceeded their authorization, Defendants obtained information therefrom.

172.     Defendants intentionally accessed Remilia's Computers without authorization and as a result of such conduct caused damage and loss, as defined in the CFAA, to Remilia.

173.     With the intent to extort from Remilia money and other things of value, Defendants and their co-conspirators transmitted in interstate and foreign commerce communications containing a demand or request for money and other things of value in relation to damage caused to Remilia's Computers, and such damage was caused to facilitate Defendants' extortion.

174.     Defendants' actions described herein have caused loss to one or more persons during a one-year period, aggregating at least $5,000 in value.

**COUNT X**
**Unjust Enrichment**

175.     Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of

this Complaint by reference into this Count as if fully set forth herein.

176.    Remilia conferred benefits on Defendants by granting them access to Remilia's accounts and assets in connection to the work Defendants performed on Remilia's behalf.

177.    Defendants appreciated the benefits conferred on them by Remilia, as Defendants knew of their access to Remilia's accounts and assets and used that access.

178.    Defendants accepted and retained the benefits Remilia conferred on them by using, maintaining, and continuing to maintain access to Remilia's accounts and assets.

179.    Defendants' retention of the benefits Remilia conferred on them by continuing to use and maintain their access to Remilia's accounts and assets is inequitable and unjust, as Defendants have employed, and continue to employ, the access granted to them to commit torts against, breach duties owed to, extort, and otherwise cause harm to Remilia.

**COUNT XI**
**Civil Conspiracy**

180.    Plaintiffs re-allege and incorporate the allegations of the foregoing paragraphs of this Complaint by reference into this Count as if fully set forth herein.

181.    Defendants have committed torts against Remilia, as described herein.

182.    Defendants and others jointly agreed to commit the torts against Remilia described herein, forming or joining a conspiracy.

183.    Defendant Smith agreed to join the conspiracy with Defendant Duff, Defendant Roux, and others through, among other means, Defendants' meetings together in Tokyo, Japan, in April 2023 and through apps on electronic devices and that Defendants commonly used to communicate with each other and others.

184.    Defendant Duff agreed to join the conspiracy with Defendant Smith, Defendant Roux, and others through, among other means, Defendants' meetings together in Tokyo, Japan, in

27

April 2023 and through apps on electronic devices and that Defendants commonly used to communicate with each other and others.

185.   Defendant Roux agreed to join the conspiracy with Defendant Smith, Defendant Duff, and others through, among other means, Defendants' meetings together in Tokyo, Japan, in April 2023 and through apps on electronic devices and that Defendants commonly used to communicate with each other and others.

186.   Defendant Smith participated in the torts against Remilia described herein by, among other things, accessing Remilia's accounts and assets for the purpose of seizing control over them; seizing control over Remilia's accounts and assets; preventing Remilia personnel from accessing Remilia's accounts, assets, or data contained therein; concealing Defendants' tortious actions by refusing to communicate with Remilia personnel; causing extortive demands to be asserted against Remilia in connection with the seizure of Remilia's accounts and assets; using Remilia's accounts or assets to cease, interrupt, or control Remilia's business operations; and using Remilia's accounts or assets to inform Remilia of Defendants' demands in relation to Remilia's seized accounts and assets.

187.   Defendant Duff participated in the torts against Remilia described herein by, among other things, accessing Remilia's accounts and assets for the purpose of seizing control over them; seizing control over Remilia's accounts and assets; preventing Remilia personnel from accessing Remilia's accounts, assets, or data contained therein; concealing Defendants' tortious actions by refusing to communicate with Remilia personnel; causing extortive demands to be asserted against Remilia in connection with the seizure of Remilia's accounts and assets; using Remilia's accounts or assets to cease, interrupt, or control Remilia's business operations; and informing Remilia of Defendants' demands in relation to Remilia's seized accounts and assets.

188.    Defendant Roux participated in the torts against Remilia described herein by, among other things, concealing Defendants' tortious actions by refusing to communicate with Remilia personnel; concealing Defendants' tortious actions by deleting files concerning the conspiracy's actions; and causing extortive demands to be asserted against Remilia in connection with the seizure of Remilia's accounts and assets.

189.    As a result of the conspiracy described herein, each Defendant is jointly and severally liable for actions taken, whether by one of the Defendants or any other co-conspirator, in furtherance of the conspiracy, and judgment should be entered against Defendants jointly and severally.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, granting the following relief:

A.    On Plaintiffs' first Count of Conversion, for monetary damages, for actual compensatory, consequential, and punitive damages to be determined with specificity at trial, and injunctive relief;

B.    On Plaintiffs' second Count of Trespass to Chattel, for actual compensatory, consequential, and punitive damages to be determined with specificity at trial, and injunctive relief;

C.    On Plaintiffs' third Count of Intentional Interference With Prospective Economic Advantage, for actual compensatory, consequential, and punitive damages to be determined with specificity at trial, and injunctive relief;

D.    On Plaintiff's fourth Count of Breach of Contract, for damages in an amount to be determined at trial, costs, attorney fees, consequential damages, exemplary damages, and any other relief to which Plaintiffs are entitled;

E.     On Plaintiffs' fifth Count of Breach of the Covenant of Good Faith and Fair Dealing, for damages in an amount to be determined at trial, costs, attorney fees, consequential damages, exemplary damages, and any other relief to which Plaintiffs are entitled;

F.     On Plaintiffs' sixth Count of Breach of Fiduciary Duty, for damages in an amount to be determined at trial, costs, attorney fees, consequential damages, exemplary damages, and any other relief to which Plaintiffs are entitled;

G.     On Plaintiffs' seventh Count of Violation of the Defendant Trade Secrets Act, 18 U.S.C. § 1836 et seq., for damages in an amount to be determined at trial, costs, attorney fees, consequential damages, statutory damages, injunctive relief, the value of the benefits obtained as a result of all Defendants' misappropriation of trade secrets, and any other relief to which Plaintiffs are entitled;

H.     On Plaintiff's eighth Count of Violation of the Nevada Uniform Trade Secrets Act, Nev. Rev. Stat. § 600A.010 et seq., for damages in an amount to be determined at trial, costs, attorney fees, consequential damages, statutory damages, injunctive relief, the value of the benefits obtained as a result of all Defendants' misappropriation of trade secrets, and any other relief to which Plaintiffs are entitled;

I.     On Plaintiffs' ninth Count of Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1830, for damages in an amount to be determined at trial, but in no event less than $5,000, including revenue lost, costs incurred, or other consequential damages, and any other relief to which Plaintiffs are entitled;

J.     On Plaintiffs' tenth Count of Unjust Enrichment, for an award in an amount to be determined at trial, in no event less than the value of the benefit unjustly retained by Defendants;

K.      On Plaintiffs' eleventh Count of Civil Conspiracy, for damages in an amount to be determined at trial, including compensatory damages for the injuries and harm suffered by Plaintiffs, for exemplary damages, and any other relief to which Plaintiffs are entitled; and

L.      For such other and further relief as this Court deems just and proper.

DATED this 11th day of September 2023.

**MICHAEL BEST & FRIEDRICH LLP**

<u>/s/ Bradley W. Madsen</u>
Bradley Madsen
Nevada Bar No. 11644
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Telephone: 801.833.0500
Facsimile:  801.931.2500
bwmadsen@michaelbest.com

*Attorneys for Plaintiffs Krishna Okhandiar*
*and Remilia Corporation LLC*